(R.D. 11163)

PANMED PHARMACEUTICALS, INC. v. UNITED STATES

Entry No. 903669.

(Decided March 31, 1966)

*Siegel, Mandell & Davidson* (*Murray Sklaroff* and *Joshua M. Davidson* of counsel) for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Harold L. Grossman*, trial attorney), for the defendant.

WILSON, Judge: This is an appeal for reappraisement of certain merchandise invoiced as "BACTERIAL POWDER OF VITAMIN B12 CONC. 705 MG/KG," manufactured by Pierrel S.p.A. of Milan, Italy, and exported therefrom on or about December 30, 1960.

The merchandise in question was appraised at $20 per net gram content of vitamin B–12, less $93.35 nondutiable charges, on the basis of export value under the provisions of section 402(b) of the Tariff

Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165. It is not disputed that export value, as adopted by the appraiser, is the proper basis for appraisement of the involved merchandise. However, the plaintiff herein claims that the actual value of the merchandise for tariff purposes is $7 per net gram of vitamin B–12 content, less the nondutiable charges.

Section 402(b) of the Tariff Act of 1930, as amended, *supra*, provides as follows:

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

There was received in evidence "The file as transmitted" (R. 12–14). Among the papers so admitted in evidence was a United States Customs Laboratory Report, No. S 2621 of February 28, 1961, which, so far as is pertinent, reads as follows:

Based on our analysis and on the invoice information, the sample is a feed grade of Vitamin B12. * * *

\*      \*      \*      \*      \*      \*      \*

It is similar to, and 5.4 times as strong as, Vitamin B12, Feed Grade, 60 mg/lb., made by Grain Processing Corp.

There was also received in evidence as plaintiff's exhibit 1 an affidavit of Niccolo' Visconti, president and general manager of Pierrel S.p.A., Via Turati, Milan, Italy, the manufacturer of the merchandise at bar. The affiant therein, who stated that he had negotiated with the plaintiff for the purchase and sale of "Vitamin B–12 Bacterial Powder," set forth his educational background and his familiarity with the imported merchandise, "having supervised and seen the processes actually conducted." He described the process of manufacturing the "Vitamin B–12 Bacterial Powder" as follows:

The anaerobial micro-organism employed in the fermentation process is cultivated on a substratum (culture broth) containing dextrose, corn steep liquor, corn seed oil and mineral salts, without fermentation precursors. This culture medium is introducted into big iron fermentors, cooked and sterilized.

The sterilized broth is inoculated with our micro-organism and fermented for a period of four days. As soon as the optimum of the fermentation is reached, fermentation is stopped and the broth is cen-

trifuged in order to collect the micro-organism cells containing the Vitamin B-12. The slurry is passed onto a drum-dryer from which the Bacterial Powder is collected.

The foregoing Bacterial Powder contains 705 mg of Vitamin B-12 per kilo of powder and this was the merchandise sold to Panmed Pharmaceuticals Inc. * * *

The aforementioned documentary exhibits comprised the plaintiff's affirmative case. The defendant, on its part, offered the oral testimony of two witnesses.

Defendant's first witness was Mr. Orva Phillips who, at the time of trial, had been employed for the past 7 years as a chemist with the Bureau of Customs at its New York Customs Laboratory. He stated that his duties in such capacity were to analyze submitted samples from importations, stating "coal tar samples are usually my specialty" (R. 26). The witness testified that he had analyzed a sample of the imported merchandise (defendant's exhibit A) and stated that he had determined that it contained vitamin B-12; and that he had compared the sample with a domestic sample of vitamin B-12 manufactured by Grain Processing Corp., Muscatine, Iowa. (Defendant's exhibit B.) A customs laboratory report of the analysis of the sample made by defendant's witness (report S 2621) indicates that defendant's exhibit B contained 60 milligrams of vitamin B-12 per pound which Mr. Phillips stated was equivalent to 132 milligrams per kilogram (R. 29-30). He stated, however, that all he did was to determine that defendant's exhibit A contained vitamin B-12 (R. 30).

Defendant's second witness was Dr. Caesar Bottone who stated that he was president of Panmed Pharmaceuticals, Inc., plaintiff herein. He testified that his duties entailed the supervision of "the whole business activity of the company" (R. 31) and that, in such capacity, he actually buys and sells merchandise and negotiates for the purchase of merchandise (R. 31-32). The record discloses that defendant's witness had acquired an education in Italy, having graduated from the University of Bologna in 1953 as a medical doctor. Subsequently, upon his return to the United States, Dr. Bottone had become engaged in the activity of buying and selling chemicals and chemical pharmaceuticals.

Dr. Bottone testified that he was familiar with "Cyanocobalamine," which is more commonly known as "Vitamin B12 Crystalline USP." He stated that he was familiar with the various uses of vitamin B-12 in its various forms (R. 32-33). Defendant's witness further testified that he had arranged and negotiated the transaction for the purchase of the imported merchandise from the manufacturer and that, in such ordering, he did not specify any special requirements as to the potency of the merchandise he was to buy. He ordered "Vitamin B12 Feed

Grade, any potency from 300 milligrams per kilo, on up" (R. 34). The witness stated that he was also familiar with the "Feed Grade Concentrates of Vitamin B12" and expressed the opinion that there is no standard content per milligram per kilo of a vitamin B-12 feed grade concentrate "from a technical point of view," nor is there any standard concentration or potency in the use of vitamin B-12 feed grade—"It may be diluted or concentrated at will and in accordance with the uses that are marked for the product" (R. 34-35). Dr. Bottone conceded, however, that he had no personal familiarity or experience with the uses of vitamin B-12 feed grade concentrates (R. 35). He stated that neither he nor anyone in his organization had any personal interest in or was employed by Pierrel, the manufacturer-exporter of the merchandise under consideration (R. 35-37). With reference to the process of manufacturing of the imported merchandise as described by Mr. Visconti (plaintiff's exhibit 1), the witness testified that while he was not a biochemist or a microbiologist and that he was not familiar in a technical sense with the process described in plaintiff's exhibit 1, "I do understand it, but I have never done this myself" (R. 39-40).

On cross-examination, Dr. Bottone testified that in the importation of merchandise, it is more practical to import a concentrated material than a more dilute material for the reason that when anything is shipped one tries to concentrate as much of the active or important ingredient or product that one purchases into as little volume as possible, especially where voluminous products are involved; that the attempt is to save the enormous cost of freight that would be charged if one imported "a low potency Vitamin B12 feed grade" (R. 41). In explanation, Dr. Bottone stated that if his firm had bought vitamin B-12 feed grade of a concentration of 60 milligrams per pound, in order to purchase the quantity that the firm had actually purchased, instead of importing 2,500 pounds which was roughly the weight of the involved shipment, his firm would have had to import about 8,000 to 10,000 pounds of material, with the consequence of having to pay the extra freight (R. 41-42). Defendant's witness further stated that negotiations for the purchase and sale of the vitamin B-12 powder took place in Milan, Italy, the location of the manufacturer herein; that Milan was the principal market for vitamin B-12 because there are only two manufacturers thereof in Italy and that both are located in Milan (R. 42). Dr. Bottone then testified that, at about the time of exportation of the merchandise at bar, he purchased certain crystalline vitamin B-12 U.S.P., a pure form of vitamin B-12, for which he paid $18 to $20 per gram (R. 42-43). The witness stated that defendant's exhibit A looked like and smelled like the product which he imported; that the imported product was not vitamin B-12 crystalline

USP but is a product "which has a very small amount of Vitamin B12 activity" (R. 43).

On redirect examination, Dr. Bottone testified that the $18 to $20 per gram price for crystalline vitamin B-12 in Italy was the price for export to the United States as well as in the domestic market, and, to the best of his knowledge, was the price quoted openly on the market (R.44). The witness further testified that he imported crystalline vitamin B-12 "around the end of '59 and the beginning of 1960." When asked what he intended to do with the involved merchandise after importation, he stated that, among other plans, "We looked at the possibility of marketing it as a feed grade * * * [and] into the possibility of purifying it and concentrating it further" (R.45).

The question here for determination is what was the export value, as defined in section 402(b) of the Tariff Act of 1930, as amended, *supra*, of the involved merchandise on the date of exportation, namely, December 30, 1960. In this connection, the law is well settled that the value returned by the appraiser is presumptively correct and that the burden rests upon the party which challenges such value to establish a contrary value for the merchandise. Further, in a reappraisement proceeding, the plaintiff has the double burden of not only proving that the action of the appraiser was erroneous but also of establishing the correct dutiable value of the merchandise in question. *Kobe Import Co.* v. *United States*, 42 CCPA 194, C.A.D. 593; *Kenneth Kittleson* v. *United States*, 40 CCPA 85, C.A.D. 502. The rule applicable in a case of this kind was succinctly set forth by our appellate court in the case of *Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495, where the court, page 41, stated:

> To sustain his burden of proof, and overcome this statutory presumption, it is incumbent upon appellant, the party challenging the value found by the appraiser in the first instance, to prove the action of the appraiser was erroneous and to establish some other dutiable value as the proper one. To do this, that party must meet every material issue involved in the case, and if he fails to do so the value fixed by the appraiser remains in full force and effect. * * *

In the case at bar, the appraiser returned a value for the involved merchandise which he found on the basis of statutory export value. The basis of value is not disputed by the plaintiff herein, its sole claim being with respect to the actual export value of the merchandise in question for tariff purposes. However, to establish that the appraised value was erroneous and that some other value was proper, it was incumbent upon the plaintiff to show that, at the time of exportation, such or similar merchandise was not freely sold, or, in the absence of sales, offered for sale to all purchasers in the principal markets of Italy, in the usual wholesale quantities and in the ordinary course of

trade, for exportation to the United States, at the presumptively correct appraised value, but at the value claimed by the plaintiff. *H. S. Dorf & Co., Inc., a/c Joseph H. Meyer Bros.* v. *United States*, 41 CCPA 183, C.A.D. 548.

In support of its contention that the presumption of correctness attaching to the appraiser's finding of value has been overcome, plaintiff herein relies upon the testimony of Dr. Caesar Bottone who was called as a witness on behalf of the defendant. Dr. Bottone testified on cross-examination, as heretofore indicated, that, at or about the time of the exportation of the merchandise at bar, he had purchased crystalline vitamin B–12 U.S.P., which is a pure form of vitamin B–12, and stated that at that time the price paid for the crystalline vitamin B–12 product ranged from $18 to $20 per gram (R. 42–43). In this connection, the witness testified that "I don't remember the exact dates, but it may have been around the end of '59 and the beginning of 1960" (R. 44). The plaintiff herein contends that the merchandise at bar is not crystalline vitamin B–12, but is merely a product which has a very small amount of vitamin B–12 activity and that the price used by the appraiser was the price for a crystalline product and not the price for a "Bacterial Powder" which plaintiff alleges was the merchandise that was imported.

In my opinion, the plaintiff in this case has not overcome the presumption of correctness attaching to the appraiser's finding of value. The so-called "unrebutted testimony" of Dr. Bottone, relied upon to overcome such presumption, relates to a purchase previously made by the plaintiff of a product which, as appears from the affidavit of Mr. Visconti, is different from that here imported. However, this purchase "around the end of '59 and the beginning of 1960" is remote from the involved date of exportation. While it may be true as contended by the plaintiff that, for appraisement purposes, the exact date of exportation or one very close to it need not be taken, the purchase of certain crystalline vitamin B–12 U.S.P. for which Dr. Bottone testified he paid $18 to $20 per gram apparently relates to a product different from that here imported. However, whether that particular purchase, made at a date not exactly established and which was quite remote from the date of exportation of the involved merchandise, was "such" as or "similar" to the importation here in question has not been shown in this record. A freely offered price for the importation at bar has not been established by any probative evidence which, within the statutory requirements, rebuts or overcomes the presumption of correctness attaching to the appraiser's finding of value. There is no evidence whatsoever in this record showing how the appraiser arrived at his presumptively correct finding of value, and the court cannot

supply this void by speculation or assume a value for the merchandise in question without probative evidence.

Further, the plaintiff has failed to sustain its burden of establishing that the claimed value, namely, the invoice value of $7 per gram of vitamin B–12 content, is the correct export value of the merchandise at bar. The only evidence offered by the plaintiff in this case in support of its claimed value was the affidavit of Mr. Niccolo' Visconti, president of the manufacturer of the imported merchandise (plaintiff's exhibit 1). As heretofore noted, the affiant stated:

That at all times since December 1960 Pierrel S.p.A. has offered Vitamin B–12 Bacterial Powder identical to or of the same class or kind as the merchandise purchased by Panmed Pharmaceuticals Inc. to all purchasers for either home consumption or export to the United States at a price of $7 per gram of Vitamin B–12 content with no restrictions as to use or disposition, and the price does not vary with the quantity purchased.

The aforesaid statement does not, in my opinion, constitute satisfactory proof of sales or offers to sell within the statutory definition of export value. The record herein is devoid of any proof of those essentials required to show that the invoice price of $7 per gram of vitamin B–12 content, claimed by the plaintiff to be the correct dutiable value of the merchandise in question, conformed with the statutory requirements to establish such claimed value as correct. The statements made by the affiant as to the prices at which the merchandise was offered and/or sold are merely unsubstantiated conclusions on the part of the affiant and are merely declarations of essential, issuable, ultimate facts which plaintiff seeks to establish. As such, they are entitled to no probative weight. *Brooks Paper Co.* case, *supra*.

Further, the list of sales indicated in plaintiff's exhibit 1 shows varying prices ranging from $7.57 per gram to $8.50 for identical concentrations of vitamin B–12, not shown to be "such" as or "similar" to the importation at bar, at or about the same invoice dates. Plaintiff's failure to produce any evidence as to market conditions at the time of exportation of the imported merchandise lacks a showing of the necessary facts essential for the court to determine whether the "list of sales" noted in plaintiff's exhibit 1 is entitled to any probative weight. Accordingly, in my opinion, the sales prices therein should be disregarded and are not pertinent in the determination of the involved merchandise. That said list of sales does not pertain to merchandise "such as" that at bar appears self evident. The involved importation consists of a "Bacterial Powder" having a concentration of 705 mg/kg, whereas the merchandise referred to in said list of sales (plaintiff's exhibit 1) consisted of "Bacterial Powder" having a concentration of either 110 mg/kg or 132 mg/kg. Likewise, in my opinion, there is no probative evidence in this record to establish that the merchandise

covered by the list of sales in plaintiff's exhibit 1 is "similar" to the merchandise at bar.

While it appears correct that the plaintiff in this case has shown a sale of the involved merchandise by the exporter-manufacturer to the plaintiff at the invoice price of $7 per gram, the elements required to establish statutory export value are not established by a mere showing that merchandise is sold to but one purchaser where the purchaser in question is not a "selected purchaser," and the record lacks evidence of sales or offers to sell to other purchasers at wholesale. A single purchaser is not *per se* a selected purchaser. *Haddad & Sons, Inc.* v. *United States*, 54 Cust. Ct. 600, Reap. Dec. 10942. For all the aforesaid reasons, plaintiff, in my opinion, has not sustained the twofold burden imposed upon it under the statute.

On the basis of the record here presented, I find as facts:

1. That the involved merchandise consists of "BACTERIAL POWDER OF VITAMIN B–12 CONC. 705 MG/KG," exported from Italy on or about December 30, 1960.

2. That the merchandise in question was not specified in the final list, T.D. 54521, published by the Secretary of the Treasury, pursuant to section 6(a) of Public Law 927.

3. That the merchandise was appraised on the basis of export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165, at $20 per net gram content of vitamin B–12, less $93.35 nondutiable charges.

4. That the evidence submitted by the importer, in this case, is not sufficient to establish that the appraised value was erroneous or to establish some other correct statutory export value.

I conclude as matters of law:

1. That export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for the value of the merchandise here involved, and

2. That the proper value for the merchandise here involved is the value found by the appraiser.

Judgment will issue accordingly.